**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 18-2465

———————

CAESARS ENTERTAINMENT CORPORATION

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL 68 PENSION FUND,
                                        Appellant

———————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-17-cv-02450)
District Judge: Honorable Kevin McNulty

———————

Argued on April 2, 2019

Before: CHAGARES, HARDIMAN, and SILER,[*] *Circuit Judges*.

(Filed: August 1, 2019)

Michael T. Scaraggi [Argued]
Oransky Scaraggi Borg & Abbamonte
175 Fairfield Avenue
Suite 1-A
West Caldwell, New Jersey 07006
        *Attorney for Appellant*

James E. Tysse [Argued]
Eric D. Field
Lawrence D. Levien
Pratik A. Shah
Raymond P. Tolentino
Akin Gump Strauss Hauer & Feld
2001 K Street N.W.
Washington, DC 20006

Brian T. Carney
Stephanie L. Lindemuth
Akin Gump Strauss Hauer & Feld
One Bryant Park
Bank of America Tower
New York, NY 10036
        *Attorneys for Appellee*

---

[*] Honorable Eugene E. Siler, Jr., Senior Circuit Judge, United States Court of Appeals for the Sixth Circuit, sitting by designation.

---

OPINION OF THE COURT

---

HARDIMAN, *Circuit Judge*.

To safeguard private pensions, Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U.S.C. § 1001 *et seq.* Six years later, Congress tried to shore up multiemployer pension plans by passing the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub. L. No. 96-364, 94 Stat. 1208. The MPPAA imposes liability on employers who withdraw from covered plans by ceasing contributions in whole or in part. This appeal involves one type of partial withdrawal, "bargaining out," which occurs when an employer "permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute . . . but continues to perform work . . . of the type for which contributions were previously required." 29 U.S.C. § 1385(b)(2)(A)(i) (ERISA § 4205(b)(2)(A)(i)).

I

The relevant facts are undisputed. Appellee Caesars Entertainment Corporation (CEC) once operated four casinos in Atlantic City: Caesars, Bally's, Harrah's, and Showboat. These comprised a "controlled group" under ERISA, with CEC being the "single employer" of the group. 29 U.S.C. § 1301(b)(1) (ERISA § 4001(b)(1)); *accord* 29 C.F.R. § 4001.2. CEC bargained with the International Union of Operating Engineers, Local 68 (the Union), for engineering work at all four casinos.

3

Under their collective bargaining agreements with the Union, each casino had to contribute to the Union's multiemployer pension fund (the Fund). The Fund had 259 contributing employers making some $14 million in annual payments. *See* Local 68 Engineers Union Pension Plan, Form 5500: FY 2013 Annual Return/Report of Employee Benefit Plan 2, 23 (2015).

In 2014, the Showboat casino closed, and CEC stopped contributing to the Fund for engineering work there. The other three casinos under CEC's control remain open, and CEC continues to pay the Fund for their Union work. Showboat's closure reduced CEC's total contributions to the Fund by 17%—well below the MPPAA's 70% threshold that would have automatically triggered liability for a partial withdrawal. *See* 29 U.S.C. §§ 1381, 1385(a)(1).

Although CEC was not automatically liable, the Fund claimed CEC was liable under the bargaining out provision of the MPPAA, which applies when an employer:

> [1] permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but [2] continues to perform work in the jurisdiction of the collective bargaining agreement *of the type for which contributions were previously required* or transfers such work to another location or to an entity or entities owned or controlled by the employer.

4

*Id.* § 1385(b)(2)(A)(i) (emphasis added); *see id.* § 1385(a)(2). CEC disagreed. So the parties went to arbitration, and CEC lost. The arbitrator held CEC had triggered both clauses [1] and [2] of the bargaining out provision. As relevant to this appeal, the arbitrator reasoned clause [2] applied because "[t]he type of work for which contributions were required at the closed Showboat is the same type of work currently being done at the remaining casinos." 2 App. 345.

The District Court reversed the arbitrator's decision. *Caesars Entm't Corp. v. IUOE Local 68 Pension Fund*, 2018 WL 3000176, at *1 (D.N.J. June 15, 2018). The Court assumed without deciding that, under clause [1], the jurisdiction of the Showboat CBA included all engineering work in Atlantic City. But it held that, under clause [2], liability exists only when an employer replaces (a) work that contributes to the pension fund with (b) "work—of the same sort—that does not." *Id.* at *8. Such replacement hadn't occurred here because CEC's "constituent members [aside from the shuttered Showboat] continue to contribute to the Fund for all engineering work they perform throughout Atlantic City." *Id.* at *9. To reach this conclusion, the Court relied on "authoritative guidance" from the Pension Benefit Guaranty Corporation (PBGC). *Id.* at *7. The Fund's appeal followed.

II

The District Court had jurisdiction under 29 U.S.C. §§ 1401(b) and 1451(c). We have jurisdiction under 28 U.S.C. § 1291. We review the summary judgment that reversed the arbitral award de novo, and we apply the same standard required of the District Court. *E.g.*, *Montanez v. Thompson*, 603 F.3d 243, 248 (3d Cir. 2010), *as amended* (May 25, 2010). We thus

5

review legal conclusions de novo but presume that the arbitrator's factual findings are correct unless they are clearly erroneous. *SUPERVALU, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Emp'rs Pension Fund*, 500 F.3d 334, 340 (3d Cir. 2007). Only legal conclusions are at issue here.

## III

We agree with the District Court that the dispositive question is whether under § 1385(b)(2)(A)(i) "work . . . of the type for which contributions were *previously* required" includes work of the type for which contributions are *still* required. The statutory text and PBGC guidance confirm that the answer is no.

## A

"Under the MPPAA, an employer who withdraws from a multiemployer pension plan becomes obligated to pay a proportionate share of the plan's unfunded vested benefits." *Crown Cork & Seal Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 861 (3d Cir. 1992). The MPPAA imposes this liability to counter the threat withdrawals pose to plan solvency. *See Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722–23 & nn.2–3 (1984).

The bargaining out provision at issue in this appeal typically applies when there is a change in union representation or the employer negotiates out of an obligation to contribute to a plan. *See, e.g.*, ABA Section of Labor & Emp't Law, Employee Benefits Law 17.III.B (4th ed. 2017 & Supp. 2018). Neither of those things happened here, but the Fund claims CEC continues to perform "work . . . of the type for which contributions

6

were previously required," 29 U.S.C. § 1385(b)(2)(A)(i), because engineering work continues at Caesars, Bally's, and Harrah's. On the Fund's view, it is irrelevant that CEC still must contribute to the Plan for the work performed by Union members at those three casinos.

We disagree. "[W]ork . . . of the type for which contributions were previously required" means "work . . . of the type for which contributions are *no longer* required." Two features of the text stand out. First, "previously" connotes something that is no longer the case. In arriving at this conclusion, we give "previously" its ordinary meaning at the time Congress enacted the relevant provision. *E.g.*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). Around the time of the MPPAA's enactment, dictionary definitions of "previous" and its adverbial form included "coming or occurring before something else; prior: *the previous owner*." The Random House Dictionary of the English Language 1535 (2d unabr. ed. 1987); *see also* The Oxford English Dictionary 1340 (2d ed. 1989) (defining "previously" as "at a previous or preceding time; before, beforehand, antecedently"); Black's Law Dictionary 1070 (5th ed. 1979) (defining "previous" as "antecedent; prior; before"). Similarly, the largest structured corpus of historical English shows that the word's most common synonyms in the 1970s–80s were "before" (the synonym used roughly 86% of the time), "earlier" (12%), and "formerly" (1%). *See* Corpus of Historical American English, BYU, https://www.english-corpora.org/coha/ (last visited May 3, 2019); *see also Muscarello v. United States*, 524 U.S. 125, 129 (1998) (using "crude[]" corpus linguistics to interpret what it means to "carry" a gun); Thomas R. Lee & Stephen C. Mouritsen, Judging Ordinary Meaning, 127 Yale L.J. 788 (2018) (explaining and applying

7

modern corpus linguistics).[1] The corpus also shows that the words that most often co-occurred with "previously" (a.k.a. collocates) were "had" (35%) and "been" (15%)—perfect tense verbs that connote completed action. *See, e.g., Carr v. United States*, 560 U.S. 438, 448 (2010). So to say something is "previously required" is to suggest it is no longer required.

Second, the canon against surplusage confirms that "previously" means "no longer required." *See, e.g., Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (applying the canon elsewhere in ERISA). If Congress had meant to adopt the Fund's interpretation, it could have omitted "previously" to no effect. The provision would have targeted work "for which contributions were [ ] required." Because that's not what Congress wrote, we give "previously" some meaning. And that meaning tracks what we've learned from dictionaries and corpus linguistics.

For these reasons, the best reading of "work . . . of the type for which contributions were previously required" excludes work of the type for which contributions are *still* required. To hold otherwise would put us in conflict with our sister courts' interpretation of identical language in another

---

[1] Corpus linguistics describes language empirically with reference to books, scripts, magazines, newspapers, and more. A database of this naturally occurring language is called a corpus. We can use corpora to perform analyses unavailable in standard sources like dictionaries. These analyses include measuring, in a given speech community over a given time, the statistical frequency of a word and the linguistic contexts in which it appears. *See* Lee & Mouritsen, *supra*, at 806–13, 828–32.

MPPAA provision, 29 U.S.C. § 1383(b)(2)(B)(i) (ERISA § 4203(b)(2)(B)(i)). Section 1383(b)(2)(B)(i) imposes complete withdrawal liability on employers in the construction industry when they continue to perform "work . . . of the type for which contributions were previously required." Two of our sister courts have held that the same provision imposes liability only when employers "cease making payments to the plan" for a type of work (*e.g.*, construction) "while continuing to do [that work] in the area." *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1090 (9th Cir. 2015); *see Stevens Eng'rs & Constructors, Inc. v. Local 17 Iron Workers Pension Fund*, 877 F.3d 663, 671–72 (6th Cir. 2017). And two more courts of appeals have signaled their support for this holding. *See Ind. Elec. Workers Pension Benefit Fund v. ManWeb Servs., Inc.*, 884 F.3d 770, 781 (7th Cir. 2018) (applying the Ninth Circuit's analysis to MPPAA successor liability); *Ceco Concrete Const., LLC v. Centennial State Carpenters Pension Tr.*, 821 F.3d 1250, 1254 (10th Cir. 2016) (citing the Ninth Circuit's analysis in interpreting the construction provision). We see no reason to interpret identical language in the bargaining out provision any differently.

B

We find additional support for our view in longstanding guidance from the Pension Benefit Guaranty Corporation, an agency that administers ERISA. *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 637 (1990). Courts "have traditionally deferred to the PBGC when interpreting ERISA," because to ignore the agency "'would be to embark upon a voyage without a compass.'" *Beck v. PACE Int'l Union*, 551 U.S. 96, 104 (2007) (alteration omitted) (quoting *Mead Corp. v. Tilley*, 490 U.S. 714, 726 (1989)).

9

In this case, the District Court found persuasive PBGC Opinion Letter 83-20, which says that no withdrawal liability results from "merely ceasing or terminating an operation." PBGC Op. Letter 83-20, 1983 WL 22426, at *2 (Sept. 2, 1983). According to the PBGC, liability under the bargaining out provision arises "only [in] situations where work of the same type is continued by the employer but for which contributions to a plan which were required are *no longer required*." *Id.* (emphasis added). So an employer isn't liable when it "closes one [facility] and shifts the work of that [facility] to other [facilities] which are covered by other [CBAs] under which contributions are made to the plan." *Id.* That's precisely what happened here. And we, like the District Court, find that the PBGC's view tracks the text of the MPPAA.

The Fund cites two other PBGC Opinion Letters (86-21 and 86-17), but both support CEC. Letter 86-21 involved an employer replacing plan-contributing work (packing produce in a shed) with non-contributing work (packing in a field). *See* PBGC Op. Letter 86-21, 1986 WL 38800, at *2 (Sept. 29, 1986). So the PBGC concluded that the employer had partially withdrawn, assuming shed-packing and field-packing were the same "type" of work. *See id.* But unlike that employer, CEC didn't shift to non-contributing work. It simply closed the Showboat operation.

Letter 86-17 addressed a company closing a CBA-covered facility. *See* PBGC Op. Letter 86-17, 1986 WL 38796, at *1 (Aug. 1, 1986). Like CEC, that company continued to contribute to the same pension plan through another facility. *See id.* But unlike CEC, that company outsourced the closed facility's work to third-parties "unrelated to the [company] in any way." *Id.* Even though that outsourcing arguably replaced contributing work with non-contributing work, the PBGC held the

company wasn't liable for bargaining out. The PBGC again stressed, as it did in Letter 83-20, that "in no case do these rules [of the bargaining out provision] impose liability on an employer for merely ceasing or terminating an operation; rather, they address only situations where work of the same type is continued by the employer but for which contributions to a plan which were required are no longer required." *Id.* at *2 (quoting 126 Cong. Rec. H7900 (daily ed. Aug. 26, 1980) (statement of Rep. Frank Thompson, Jr.)). In sum, when the PBGC addressed practically the same situation we face here, it refused to find withdrawal liability against the employer.

IV

The Fund's final response to the textual and administrative headwinds we have described is an appeal to purposivism. According to the Fund, the "fundamental purpose" of the MPPAA is to ensure the solvency of employee pensions. Fund Br. 30. So CEC simply must be liable because Showboat's closure decreased the Fund's contribution base. And failing to impose liability would allegedly allow a "race for the exits" in which the three other CEC casinos could stop contributing without consequence. *Id.*

Once again, we disagree. The MPPAA's purpose is neither one-dimensional nor easy to promote through employer liability. It's certainly true that the MPPAA aims to foster both "maintenance and growth" of multiemployer plans. 29 U.S.C. § 1001a(c)(2) (MPPAA, § 3(c)(2), 94 Stat. at 1209); *accord Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 168 (3d Cir. 2002). But as counsel for the Fund acknowledged at oral argument, if we adopted the Fund's interpretation, employers would even be liable for conduct that does not reduce their pension contributions. *See* Oral Argument

11

Audio 3:20–4:45. The risk of such capricious liability would discourage "the maintenance and growth of multiemployer pension plans" in the first place. 29 U.S.C. § 1001a(c)(2). Incentives matter, and employers have many alternatives to multiemployer plans. *See generally* SEC, Employer-Sponsored Plans, Investor.gov (last visited Apr. 30, 2019), https://www.investor.gov/introduction-investing/retirement-plans/employer-sponsored-plans [https://perma.cc/5PLE-KM3E]. So employers would be less likely to opt into the MPPAA's regulatory regime if it imposed liability on innocuous business activities.

The Fund's position thus shows why "it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam). Rather than appealing to broad statutory objectives, pension funds should look to Congress's statutory safeguards against plan insolvency. Among these are the 70% rule for automatic partial withdrawals, 29 U.S.C. § 1385(a)(1), and a catch-all clause that imposes liability on "any transaction" that has "a principal purpose . . . to evade or avoid liability," *id.* § 1392(c) (ERISA § 4212(c)). For an employer to avoid automatic liability, any decrease in contributions must be made gradually over an eight-year period. *See id.* § 1385(b)(1); *Cent. States, Se. & Sw. Areas Pension Fund v. Safeway, Inc.*, 229 F.3d 605, 611 (7th Cir. 2000). And to avoid catch-all liability, an employer must act in good faith. *SUPERVALU, Inc.*, 500 F.3d at 341–42. "Even if Congress could or should have done more, still it 'wrote the statute it wrote—meaning, a statute going so far and no further.'" *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1073 (2018) (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014)).

\* \* \*

For the reasons stated, we hold that "work . . . of the type for which contributions were previously required" does not include work of the type for which contributions are *still* required. And because CEC continues to contribute to its pension plan for engineering work at its remaining three casinos, it is not liable under § 1385(b)(2)(A)(i). We will affirm the judgment of the District Court.