**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1537
_____

ALLIED PAINTING & DECORATING, INC.

v.

INTERNATIONAL PAINTERS AND ALLIED TRADES
INDUSTRY PENSION FUND,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 3-21-cv-13310)
District Judge: Honorable Peter G. Sheridan
_____

Argued January 18, 2024

Before: HARDIMAN, MATEY, and PHIPPS, *Circuit Judges*.

(Filed: July 11, 2024)
_____

Neil J. Gregorio
Jill D. Helbling
Richard B. Tucker, III **[ARGUED]**
Tucker Arensberg
One PPG Place
Suite 1500
Pittsburgh, PA 15222
    *Counsel for Appellant*

Gregory R. Begg **[ARGUED]**
Peckar & Abramson
70 Grand Avenue

Suite 200
River Edge, NJ 07661
*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

**MATEY**, *Circuit Judge*.

Twelve years after Allied Painting & Decorating, Inc. withdrew from the International Painters and Allied Trades Industry Pension Fund, the Fund sent Allied a demand for $427,195. That is the amount the Fund says Allied owes for leaving the pension plan all those years ago. Much is made of whether Allied suffered prejudice from this lengthy delay. But diligence is what the Multiemployer Pension Plan Amendments Act of 1980 requires, and all agree that the Fund did not send Allied the bill "[a]s soon as practicable" after Allied's withdrawal. 29 U.S.C. § 1399(b)(1). As a result, the Fund cannot recover the claimed withdrawal liability, and we will affirm the District Court's order vacating the Arbitrator's Award.

**I.**

This dispute turns on the meaning of the MPPAA, 29 U.S.C. §§ 1381–1461, an amendment to the Employee Retirement Income Security Act of 1974 enacted "to protect the financial solvency of multiemployer pension plans." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997). With it, Congress put to paper a statutory scheme allowing private pension funds to recoup money from employers that join, and then abandon, pension plans. The idea is to keep the funds solvent and avoid employers promising but not paying retirement benefits, leaving workers without the security they earned from their labor. So Congress created "withdrawal liability" to hold employers responsible for their share of unfunded vested

2

benefits accruing after they exit a pension plan.[1] *See* 29 U.S.C. §§ 1381, 1391. That liability is what is at issue.

## A.

In 2001, Allied—a painting company—signed an agreement with District Council 711 of the International Painters Union running from May 1, 2000 to April 30, 2006[2] and requiring Allied to contribute to the Fund. In 2005, Allied closed its painting operations and stopped contributing to the Fund. For the next year, Allied submitted monthly reports to the Fund showing that it utilized no Painters Union work through the expiration of the agreement in April 2006.[3]

---

[1] For the curious, "unfunded vested benefits" means an amount equal to the value of nonforfeitable benefits under the plan less the value of the assets of the plan. 29 U.S.C. § 1393(c). This arithmetic is not at issue here.

[2] The Arbitrator found that Allied was covered by a collective bargaining agreement between the Painters Union and a coalition of employers—not including Allied—because the agreement was "implemented by Allied," App. 89—a finding presumed correct because Allied has not shown a clear preponderance to the contrary. *See* 29 U.S.C. § 1401(c). A page with Allied owner Robert Smith's signature provides that Allied and the Painters Union "are desirous of entering into an agreement to set forth control and regulate the wages, hours, fringe benefits, terms and conditions of employment under which the employer will employ painters, tapers, glaziers and allied trades, effective May 1, 2000 through April 30, 2006." App. 1034 (cleaned up). This mirrors the terms of the collective bargaining agreement. And records showed that Allied contributed to the Fund for work performed through April 2005 and submitted reports to the Fund showing it utilized no Painters Union work through April 2006—acts it would not have taken if it were not bound by such an agreement.

[3] Allied says it might have agreed with the Painters Union to cancel the collective bargaining agreement by 2004 or 2005. But the Fund conceded before the Arbitrator that Allied's obligation to contribute under the agreement ceased on April 30, 2005, and the Arbitrator accepted this fact.

But Robert Smith—Allied's owner—returned to painting a few years later with a new company called Allied Construction Management.[4] The MPPAA kicks in when an employer in the building and construction industry[5] "ceases to have an obligation to contribute under the plan"[6] but "resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption." 29 U.S.C. § 1383(b)(2).[7] Meaning Allied's return to painting potentially triggered withdrawal liability. It just needed to hear from the Fund.

**B.**

But the Fund did not rigorously track, much less assess, employer withdrawals. After developing and implementing a new computer system between 2008 and 2010, the Fund began generating annual reports showing the employers that had not contributed in the last five years. The reports revealed a backlog of hundreds of cases for investigation to determine whether each noncontributing employer owed withdrawal liability and, if so, how much. And the investigations moved slowly, with notices gradually trickling out to employers. So

---

[4] Allied admitted as much before the Arbitrator. *See* App. 466 ("Allied/[Allied Construction Management] had, openly and notoriously, performed covered work immediately after the cessation of the obligation to contribute, and for a period of years thereafter."). Because Smith owned both entities, they were "under common control" and considered the same employer for assessing withdrawal liability. *See* 29 U.S.C. § 1301(b)(1).

[5] All agree that Allied is in the building and construction industry.

[6] "[O]bligation to contribute" means "an obligation to contribute arising—(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law, but does not include an obligation to pay withdrawal liability . . . or to pay delinquent contributions." 29 U.S.C. § 1392(a).

[7] "[T]he date of a complete withdrawal is the date of the cessation of the obligation to contribute or the cessation of covered operations." 29 U.S.C. § 1383(e).

while Allied's potential liability came to the Fund's attention in a 2011 report, the Fund did not notify Allied until July 2017.

## C.

Finally served with a payment demand twelve years after it last contributed to the Fund, Allied requested review[8] and demanded arbitration.[9] Objecting based on laches, Allied explained that, by the time the Fund notified Allied of its withdrawal liability and demanded payment, Allied had no records about Painters Union work, having purged its records under its standard retention practices. And, Allied contended, anyone with personal knowledge about the matter was no longer employed or, in some cases, even identifiable.

The Arbitrator issued several decisions and concluded that Allied owed $427,195 for its withdrawal.[10] The Arbitrator first found that the Fund did not act "as soon as practicable" in issuing a notice and demand to Allied and that the Fund's delay was unreasonable. *See* 29 U.S.C. § 1399(b)(1). But then the Arbitrator concluded that Allied had failed to establish severe or material prejudice, which doomed its laches defense.[11] On

---

[8] The employer has ninety days after it receives notice of the withdrawal-liability amount to seek review by the fund, identify inaccuracies in the calculation of the amount, and furnish additional information to the fund. 29 U.S.C. § 1399(b)(2)(A). "After a reasonable review of any matter raised," the fund must notify the employer of its decision, along with the basis for its decision and the reason for any change in the determination of the employer's liability or schedule of payments. *Id.* § 1399(b)(2)(B).

[9] "Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under [the MPPAA provisions relating to the assessment, notice, and demand of withdrawal liability, among other provisions] shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1).

[10] Allied did not contest the Fund's withdrawal-liability calculation.

[11] "The elements of the equitable defense of laches are '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'"

appeal, the District Court found that Allied was prejudiced by the delay and vacated the Award. We will affirm the District Court's order vacating the Award, though on different grounds.[12]

## II.

"We review the summary judgment that reversed the arbitral award de novo, and we apply the same standard required of the District Court" on summary judgment. *Caesars Ent. Corp. v. Int'l Union of Operating Eng'rs Loc. 68 Pension Fund*, 932 F.3d 91, 94 (3d Cir. 2019). When a district court reviews an arbitration award under 29 U.S.C. § 1401(b)(2), the district court "presumes that the arbitrator's factual findings are correct unless they are rebutted by a clear preponderance of the evidence," and "[t]he arbitrator's legal conclusions are reviewed *de novo*." *Crown Cork & Seal Co. v. Cent. States Se. & Sw. Areas Pension Fund*, 982 F.2d 857, 860 (3d Cir. 1992) (citing 29 U.S.C. § 1401(c) and *Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 89 (3d Cir. 1990)). "We may affirm on any basis supported by the record, even if it departs from the District Court's rationale." *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019).

Although the District Court applied the Federal Arbitration Act standard for vacating an arbitration award, *see* 9 U.S.C. § 10(a), the MPPAA provides that the FAA's provisions apply only "to the extent consistent" with the MPPAA, 29 U.S.C. § 1401(b)(3). The FAA does not permit vacating an arbitration award for "simply an error of law." *Whitehead v. Pullman Grp., LLC*, 811 F.3d 116, 120 (3d Cir.

---

*Equal Emp. Opportunity Comm'n v. Great Atl. & Pac. Tea Co.*, 735 F.2d 69, 80 (3d Cir. 1984) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)). "To establish prejudice, the party raising laches must demonstrate that the delay caused a disadvantage in asserting and establishing a claimed right or defense; the mere loss of what one would have otherwise kept does not establish prejudice." *U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 208 (3d Cir. 1999).

[12] The District Court had jurisdiction under 29 U.S.C. §§ 1401(b)(2) and 1451(c), and we have jurisdiction under 28 U.S.C. § 1291.

2016) (quoting *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.*, 397 F.2d 594, 599 (3d Cir. 1968)). But the MPPAA permits review of the arbitration award by courts "to enforce, vacate, or modify" the award, 29 U.S.C. § 1401(b)(2)—review that includes de novo consideration of the arbitrator's legal conclusions, *see Crown Cork & Seal Co.*, 982 F.2d at 860 (citing *Huber*, 916 F.2d at 89). So the FAA is inconsistent with the MPPAA in this respect, and the MPPAA's standard applies.[13]

## III.

"As soon as practicable" after an employer's withdrawal from a pension fund, the fund must "notify the employer of" the amount of withdrawal liability and a schedule for liability payments and "demand payment in accordance with the schedule." 29 U.S.C. § 1399(b)(1). No one challenges the Arbitrator's conclusion that the Fund did not act "as soon as practicable" when it provided notice of Allied's withdrawal liability and demanded payment twelve years after Allied's obligation to contribute to the Fund ceased. That conclusion ends this matter under the best reading of the MPPAA.

## A.

The "as soon as practicable" deadline sets no rigid timeframe. Congress's "adoption of a looser 'as soon as practicable' requirement for the initial determination of withdrawal liability bespeaks a deliberate legislative choice to afford some flexibility in gathering the information and performing the complex calculations necessary to make that assessment." *Bay Area*, 522 U.S. at 205.[14] In *Bay Area*, the

---

[13] Several circuits agree. *See, e.g.*, *Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Va. Pension Fund*, 718 F.2d 628, 641 (4th Cir. 1983); *Union Asphalts & Roadoils, Inc. v. MO-KAN Teamsters Pension Fund*, 857 F.2d 1230, 1234 (8th Cir. 1988); *Trs. of Iron Workers Loc. 473 Pension Tr. v. Allied Prods. Corp.*, 872 F.2d 208, 212 (7th Cir. 1989); *GCIU-Emp. Ret. Fund v. MNG Enters., Inc.*, 51 F.4th 1092, 1097 (9th Cir. 2022).

[14] *See also ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 887 (2d Cir. 1988) ("We do not read the notice requirement of 29 U.S.C. § 1399(b)(1), which

Supreme Court considered when the "MPPAA's six-year statute of limitations begin[s] to run on a pension fund's action to collect unpaid withdrawal liability[.]" *Id.* at 195. Congress's answer—the Court acknowledged—may not satisfy the long-waiting employer. *See id.* at 204. The six-year statute of limitations, 29 U.S.C. § 1451(f)(1), begins to run not when the employer withdraws from the fund, when withdrawal liability is assessed and noticed, or even when the demand is made, but when the employer defaults on an installment "due and payable" following the fund's notice and demand. *Bay Area*, 522 U.S. at 202. "Only then has the employer violated an obligation owed the [fund] under the [MPPAA]." *Id.*

Statutory meaning stated, the Court addressed the concern that its interpretation of § 1451(f)(1) would place the running of the statute of limitations in the control of the fund. *Id.* at 204–05. Unfair it may seem, but "that is an unavoidable consequence of the scheme Congress adopted. Congress did not set a fixed time during which a pension fund's trustees must calculate the employer's withdrawal liability, although it surely could have done so." *Id.* at 204. "Notably," the Court said, "Congress adopted specific time limits to govern a number of other steps in the assessment and collection process," while its "adoption of a looser 'as soon as practicable' requirement for the initial determination of withdrawal liability" was a "deliberate legislative choice to afford [the funds] some flexibility." *Id.* at 204–05.

Not to worry, the Court assured, since financial and prudential factors will motivate funds to bring claims for unpaid amounts quickly, and employers can raise a laches defense if a fund delays. *Id.* at 205. In particular, "'significant incentives . . . will, in the usual case, induce plan sponsors to act promptly to calculate, schedule, and demand payment of withdrawal liability,'" and "if an employer believes the trustees have failed to comply with their 'as soon as practicable'

provides that notice must be sent to employers '[a]s soon as practicable' after withdrawal, to impose 'a strict deadline for notifying employers of their withdrawal liability.'" (alteration in original) (quoting *I.A.M. Nat'l Pension Fund Plan A, A Benefits v. Cullman Indus., Inc.*, 640 F. Supp. 1284, 1288 (D.D.C. 1986))).

responsibility, the employer may assert that violation as a laches objection at an arbitration contesting the withdrawal liability assessment." *Id.* (omission in original) (quoting *Joyce v. Clyde Sandoz Masonry*, 871 F.2d 1119, 1126 (D.C. Cir. 1989)).

But the Court did not merge the words of Congress with the protections of equity by interpreting "as soon as practicable" to incorporate the two prongs of the laches defense.[15] *Bay Area* resolved only the issue of how to read the time limitation on filing a suit under the MPPAA. The reference to laches comes in that context, addressing—in dicta—a potential defense to a suit brought within the six-year statute of limitations from when the employer defaults on a payment.

---

[15] The alternative view reads *Bay Area* to say that laches is the *required* vehicle to challenge the timeliness of the withdrawal-liability notice and demand. *See, e.g.*, *PACE Indus. Union-Mgmt. Pension Fund v. Troy Rubber Engraving Co.*, 805 F. Supp. 2d 451, 464 (M.D. Tenn. 2011) ("This dicta not only suggests that arbitration is the proper forum in which to raise objections to a delay in the notice of liability and demand for payment, but also intimates that laches is not a separate defense to liability from a failure to provide notice 'as soon as practicable' under the MPPAA, but instead is the proper means of making this argument."); *Pavers & Rd. Builders Dist. Council Pension Fund by Montelle v. Nico Asphalt Paving, Inc.*, 248 F. Supp. 3d 374, 380 (E.D.N.Y. 2017) (viewing "objection to the timeliness of the withdrawal notice [a]s subsumed by [the] laches defense"). But this approach mistakes "may" for "must" and turns dictum into a decision on the meaning of statutory text outside the question presented. And it suffers from the too-common trend of "treating judicial opinions like statutes." *OI Eur. Grp. B.V. v. Bolivarian Republic of Venez.*, 73 F.4th 157, 175 n.22 (3d Cir. 2023); *see also Brown v. Davenport*, 596 U.S. 118, 141 (2022) ("This Court has long stressed that 'the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute.'" (alteration in original) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979))).

**B.**

With the limits of *Bay Area* mapped, we turn to the usual task of giving effect to Congress's directive by looking first to the text of the law and reading its words "in their usual and most known signification." *Berkelhammer v. ADP TotalSource Grp., Inc.*, 74 F.4th 115, 118 (3d Cir. 2023) (quoting 1 William Blackstone, Commentaries *59). Doing so yields three steps for a fund to assert a withdrawal-liability claim:

Step One: The employer must withdraw from the plan. *See* 29 U.S.C. §§ 1381, 1383.

Step Two: "As soon as practicable"[16] after withdrawal, the fund must A) provide notice to the employer of its withdrawal-liability assessment and B) demand payment from the employer. *Id.* § 1399(b)(1).

Step Three: The employer must default on a payment "due and payable." *See Bay Area*, 522 U.S. at 202. Until that step is taken, the employer has not "violated an obligation owed the [fund] under the [MPPAA]," and the fund's "interest in receiving withdrawal liability does not ripen into a cause of action." *Id.*

Once timely notice and demand is sent and payment is not delivered when due, the fund's six-year clock to file a claim for payment under § 1451(f)(1) begins to run. *Id.* Because the missed payment, not the withdrawal, triggers the statute of limitations and because § 1399(b)(1)'s "as soon as practicable" requirement is flexible, a fund's claim may still be timely even if filed many more than six years from the date of the employer's withdrawal.

Neither the statute nor *Bay Area* requires employers to prove prejudice at Step Two. If a fund does not issue its demand "as soon as practicable," then it has not satisfied one

---

[16] A phrase familiar to the common law, "as soon as practicable" means "reasonable time," but is "not synonymous with 'as soon as possible.'" *As Soon As Practicable*, Black's Law Dictionary 112 (5th ed. 1979).

of the elements of the MPPAA.[17] To read the statute otherwise reads out the practicability requirement from the pages of the United States Code. "[I]t is of course our job to apply faithfully the law Congress has written, [and] it is never our job to rewrite a . . . valid statutory text." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017).

An example illustrates the point: Consider the absent-minded fund manager and the diligent employer. Following withdrawal, the fund calculates, but never sends, a payment demand. Decades pass before the fund finally delivers notice. Meanwhile, the diligent employer has held onto all its records and, for good measure, long ago escrowed enough to pay the demand. The employer then refuses to pay, the fund sues, and the diligent employer cannot raise a laches defense because the

---

[17] *See Joyce*, 871 F.2d at 1126–27 ("A delinquent sponsor may always be met in arbitration . . . with the argument that the plan has by virtue of delay run afoul of the Act's command that the plan sponsor demand payment of withdrawal liability 'as soon as practicable after the employer's complete . . . withdrawal.'" (second omission in original) (quoting 29 U.S.C. § 1399(b))), *cited in Bay Area*, 522 U.S. at 205; *Giroux Bros. Transp., Inc. v. New Eng. Teamsters & Trucking Indus. Pension Fund*, 73 F.3d 1, 3–4 (1st Cir. 1996) (The "statutory framework governing a plan sponsor's demand for withdrawal liability payment [is] sufficiently clear so that to the extent the general 6 year limitation on actions conflicts, Congress did not intend it to override," and "questions concerning the timeliness of a plan sponsor's demand are governed exclusively by § 1399(b)(1)," so "resolution of [the employer]'s claim turns solely on whether the [f]und's demand was made 'as soon as practicable' after [the employer]'s withdrawal."). Recall that the statute-of-limitations question and the as-soon-as-practicable question are distinct inquiries. An inquiry into whether an employer received notice "as soon as practicable" following the employer's withdrawal "would only become relevant after a finding that the action was filed within the six year limitations period, and that further issues governed by the MPPAA could be explored." *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.-Pension Fund v. Kero Leasing Corp.*, 377 F.3d 288, 294 n.4 (3d Cir. 2004).

slow suit, even if unreasonable, produced no prejudice. But the "as soon as practicable" requirement is not the same as a laches defense. Section 1399(b)(1) addresses not the unreasonable, prejudicial delay in starting a suit; it requires prompt delivery of notice and payment demand as a predicate to suing. Where the fund has not sent notice and demanded payment "as soon as practicable" after the employer's withdrawal, the fund has not satisfied its requirements under § 1399(b)(1). The contrary reading would render the "as soon as practicable" requirement of § 1399(b)(1) meaningless.

## C.

The Arbitrator concluded that "the Fund did not act [']as soon as practicable' in issuing an assessment of withdrawal liability in 2017 with respect to a withdrawal which had occurred no later than 2006." App. 107, 121. The District Court did not disturb this conclusion, and neither party disputes it. That is the end of the case, since the Arbitrator's conclusion that the "as soon as practicable" requirement was not met means the requirements of the MPPAA are also lacking.

The Arbitrator's error in requiring prejudice not present in the MPPAA warrants vacating the Arbitration Award. That a fund provide notice of its withdrawal-liability assessment and demand payment from the employer "as soon as practicable" following the employer's withdrawal is a requirement of § 1399(b)(1). If this statutory requirement is not met, the fund's claim for the employer's withdrawal liability must fail.

* * *

The "as soon as practicable" requirement under § 1399(b)(1) is an independent statutory requirement, and it was not met here. So the Fund cannot recover the withdrawal-liability amount from Allied under the MPPAA, and we will affirm the District Court's order vacating the Arbitrator's Award.

12