In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-1827

NATIONAL SHOPMEN PENSION FUND, *et al.*,

*Plaintiffs-Appellants.*

*v.*

DISA INDUSTRIES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 6983—**Virginia M. Kendall**, *Judge.*

ARGUED SEPTEMBER 29, 2010—DECIDED AUGUST 8, 2011

Before BAUER, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* DISA Industries, Inc., is an Illinois corporation engaged principally in the foundry equipment business. In 2000 and 2001, DISA contributed to the National Shopmen Pension Fund, a multiemployer pension plan established pursuant to a collective bargaining agreement with the Shopmen's Local Union No. 508. After only two years of contributing to the

Fund, DISA closed the facility covered by the labor contract, triggering withdrawal liability under federal law. On June 21, 2006, National Shopmen notified DISA of its liability under the statute and set a 20-year payment schedule requiring the company to pay $652 per month. National Shopmen then sent another letter several months later saying that it had miscalculated the amount due each month, but not the underlying withdrawal liability, and advised DISA to increase its monthly payments from $652 to $978. DISA has been paying the original amount requested in a timely manner, but it has refused to pay the revised monthly sum of $978. DISA contends that National Shopmen increased the asserted amount due through an interpretation of the applicable law that is plainly mistaken; under the correct reading of the law, DISA believes, it has no obligation to pay the higher amount.

National Shopmen then upped the ante by filing suit in the Northern District of Illinois asserting that DISA is in default for failure to pay the full amount requested, see 29 U.S.C. § 1399(c)(5)(A), and that DISA's failure to resolve the dispute through mandatory arbitration proceedings counts as a forfeiture of any right to challenge the Fund's interpretation of the statute. The district court concluded that DISA's failure to exhaust its administrative remedies was immaterial because the Fund also failed to seek arbitration when it revised DISA's withdrawal liability. The court then dismissed the complaint based on a finding that National Shopmen's interpretation of the statute, on which it relied in demanding the increased sum from DISA, was plainly incorrect, and

so DISA was not in default. We think that DISA's failure to exhaust its administrative remedies is dispositive and therefore we reverse the judgment of the district court.

**I**

This case arises under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980, (MPPAA), see 29 U.S.C. §§ 1301-1461. Congress enacted the MPPAA to address the risk of insolvency that arises when an employer withdraws from a pension plan. When that happens, the plan must ensure that it is adequately funded to provide benefits to workers as promised. See *Central States, Se. and Sw. Areas Pension Fund v. O'Neill Bros. Transfer and Storage Co.*, 620 F.3d 766, 767-68 (7th Cir. 2010). The MPPAA discourages withdrawal and protects the solvency of multiemployer pension plans by making an employer that withdraws from the plan "liable for an amount of money designed to cover the employees' share of the vested, but unfunded, benefits." *Robbins v. Lady Baltimore Foods, Inc.*, 868 F.2d 258, 261 (7th Cir. 1989); see also 29 U.S.C. §§ 1381, 1391. In essence, the MPPAA is designed to change the "strategic considerations" for an employer contemplating withdrawal from a multi-employer pension plan, ensuring that employers cannot use withdrawal as a way of avoiding their full liability to participants whose benefits have vested. See *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz*

*Brewing Co.,* 513 U.S. 414, 417 (1995) (providing detailed analysis of the purpose and operation of the MPPAA).

There is no doubt that DISA completely withdrew from the Fund in 2002, see § 1383, triggering withdrawal liability under the MPPAA. For reasons that are not relevant to this action, National Shopmen waited until June 21, 2006, to notify DISA of its withdrawal liability, which it pegged at $372,472. The Fund then established a 20-year schedule that required DISA to pay $652 per month. (The district court's opinion stated that this led to a total payment of $127,761. We do not understand that, since $652 x 20 x 12 equals $156,480. The difference, however, is immaterial to our disposition of the case, and so we do not need to resolve the inconsistency.) The discrepancy between the calculated withdrawal liability of $372,472 and DISA's projected total payment due is a product of the formula used to calculate an employer's annual liability paid over a period of years necessary to amortize the liability, see 29 U.S.C. § 1399(c)(1)(A), and the provision that limits the employer's liability to 20 years, see § 1399(c)(1)(B). See also *Milwaukee Brewery*, 513 U.S. at 418-19. DISA began paying $652 per month and pursued the proper channels of review as set forth in the statute.

For six months, matters progressed exactly as envisioned by the MPPAA's "pay now, fight later" regime. As we have said time and again, an employer is almost always required to make payments while it seeks review of a fund's calculation of withdrawal liability, see § 1399(b)(2)(A), or pursues arbitration, see § 1401(a)(1).

*Central States, Se. and Sw. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 272 F.3d 1000, 1002-03 (7th Cir. 2001). This is to ensure that the pension plan remains solvent while the parties resolve their dispute—a process that can take many years. To this end, the MPPAA requires an employer to make interim payments "in accordance with the schedule set forth by the plan sponsor . . . notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule." § 1399(c)(2). If the employer defaults by failing to make the appropriate payments, see § 1399(c)(5)(A), matters progress in one of two ways. Assuming that the employer refuses to make "interim" liability payments, meaning while arbitration is pending, the plan may file suit to collect only the interim payments, not the entire amount. See *Chicago Truck Drivers, Helpers and Warehouse United (Independent) Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526, 533 (7th Cir. 1997) ("The better reading of § 1401 is that it conditions the accelerating of withdrawal liability on an employer not seeking arbitration."). But if the employer fails to make the demanded payments and fails to seek arbitration, the plan may immediately file suit to seek accelerated payments. See §§ 1401(b)(1) ("If no arbitration proceeding has been initiated . . . the amounts demanded by the plan sponsor . . . shall be due and owing . . .") and 1399(c)(5) ("In the event of default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability . . .").

DISA complied with these provisions following its receipt of the original assessment of liability. It began

paying $652 each month, asked the Fund to review the liability assessment, and submitted a letter stating its intent to seek arbitration. Things changed, however, when National Shopmen notified DISA on January 24, 2007, that it had made an error in calculating DISA's monthly payments. Initially, National Shopmen was reticent in explaining what kind of error caused the miscalculation, yet it demanded that DISA begin paying $978 per month and remit an additional $1,956 to cover what it owed for the prior six months based on the revision. As the Fund provided more information concerning the supposed error in a letter dated February 15, 2007, however, it became clear that at issue was the interpretation of the statute governing the calculation of each annual liability payment, which naturally determines how much is due each month.

To provide context for this dispute, we must now turn to 29 U.S.C. § 1399(c)(1)(C)(i), which provides:

> Except as provided in subparagraph (E), the amount of each annual payment shall be the product of--
>
>> (I)  the average annual number of contribution base units for the period of *3 consecutive plan years*, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and
>>
>> (II) the highest contribution rate at which the employer had an obligation to contribute under

> the plan during the 10 plan years ending with the
> plan year in which the withdrawal occurs.

(emphasis added). Recall that DISA participated in National Shopmen's pension plan for only two years before closing its covered facility, raising the question of how to calculate the average for "3 consecutive plan years." When National Shopmen first calculated the 20-year payment schedule, it averaged the annual number of contribution base units for the two years that DISA contributed to the plan with a zero for the third year. That calculation required DISA to pay $652 each month. The Fund then altered its interpretation of the statute, concluding that only years "for which the employer had an obligation to contribute under the plan," see § 1399(c)(1)(C)(i)(I), should be included in the calculation. This led it to calculate an average based solely on the two years that DISA contributed to the plan, resulting in monthly payments from DISA of $978 instead of $652.

Unsurprisingly, DISA disagreed with National Shopmen's revised assessment. The company filed a demand for arbitration in March 2007, but refused to pay the higher amount in the interim. In response, on January 23, 2008, National Shopmen filed suit in the District of Columbia seeking interim payments in the amount of $978 per month while arbitration was pending. Before the district court, DISA defended by arguing that it remained in compliance with the MPPAA by paying the original amount requested, and it further contended that National Shopmen's revised calculation based on

only two years' experience was in conflict with the statute. The district court expressed serious doubt that National Shopmen's revised calculation of withdrawal liability was correct, but it concluded that the question should be resolved by the arbitrator. See *National Shopmen Pension Fund v. DISA*, 583 F. Supp. 2d 95, 101 (D.D.C. 2008) (*Shopmen I*). As for the interim payments, *Shopmen I* acknowledged the general applicability of the "pay-now-arbitrate-later" rule, but thought that to apply the rule to revised assessments would permit pension plans "to subject employers to a pattern of oppressive behavior" by increasing liability payments capriciously. *Id.* at 102-03. Thus, the court concluded that DISA was not required to pay the higher amount while arbitration was pending, and it dismissed National Shopmen's complaint.

With this triumph in hand, DISA withdrew its arbitration demand on March 23, 2009. National Shopmen did not oppose that move, nor did it initiate arbitration on its own. Instead, by a letter dated April 8, 2009, National Shopmen notified DISA that since arbitration was no longer pending, monthly payments of $978 were immediately due. The letter took the position that DISA's failure to pay $978 per month and remit the difference between $978 and $652 for all prior months (with interest) within 60 days would constitute default under the statute. DISA rejected the demand, although it continued to pay $652 per month. On November 11, 2009, after the 60-day deadline had long passed, National Shopmen again filed suit, this time in the Northern District of Illinois, alleging that DISA had failed to cure its delin-

quency in a timely manner and was therefore in default under 29 U.S.C. § 1399(c)(5), making DISA's entire withdrawal liability due and owning, see § 1401(b)(1). National Shopmen further contended that since DISA failed to exhaust its administrative remedies, it forfeited the right to assert any defense on the merits.

The district court was not persuaded. See *National Shopmen Pension Fund v. DISA Industries, Inc.*, No. 09 C 6983, 2010 WL 1251446 (N.D. Ill. March 24, 2010) (*Shopmen II*). *Shopmen II* rejected the Fund's contention that DISA forfeited all defenses to the calculation of withdrawal liability by failing to arbitrate the matter. The court opined that for National Shopmen "[t]o now argue that DISA is foreclosed from opposing the Fund's reassessment would also seem to imply that the Fund should be foreclosed from re-seeking the increased monthly payments after failing to pursue them in arbitration." *Id.* at *4. The court rejected that proposition, concluding instead that the MPPAA's exhaustion requirements apply to pension funds and employers alike. Since National Shopmen failed to object to DISA's withdrawal from arbitration or to seek arbitration in its own right, the court concluded that DISA's failure to seek arbitration would not preclude it from defending on the merits in federal court. The district court then held that National Shopmen's use of a two-year average conflicted with the plain language of the statute requiring an average of three years. Based on that, the court found that DISA was not in default and dismissed the complaint for failure to state a claim. This appeal followed.

**II**

National Shopmen argues that the district court made two errors that require reversal. First, the Fund contends that the court erred by allowing DISA to challenge its calculation of monthly liability payments without pursuing arbitration first. Second, it argues that its interpretation of the statute requiring DISA to pay $978 each month is correct. After oral argument, we invited the Pension Benefit Guarantee Corporation (PBGC) to provide its views on the issues presented, and we appreciate the agency's submission of its *amicus* brief. We review the district court's decision to dismiss the plaintiff's complaint, along with issues of statutory interpretation, *de novo*. See *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (motion to dismiss) and *Manning v. United States*, 546 F.3d 430, 432 (7th Cir. 2008) (statutory interpretation).

We begin with the district court's conclusion that DISA's failure to exhaust was beside the point since National Shopmen also failed to seek arbitration. This view presumes that the exhaustion requirements apply equally, at least here, to the Fund and the employer. As we understand it, the court's analysis on this issue was based on the atypical facts of this case, where the Fund revised DISA's monthly payment schedule based on a questionable interpretation of the statute after DISA had been making payments according to the original assessment. These circumstances, according to the court, gave rise to an obligation for National Shopmen to seek arbitration when it revised the assess-

ment. From there, the court leapt to the conclusion that National Shopmen's failure to seek arbitration absolved DISA of its statutory duty to arbitrate any dispute relating to the calculation of withdrawal liability.

This line of reasoning is problematic. It is true that § 1401(a) says that "[e]ither party may initiate the arbitration proceeding," suggesting a symmetry in the burdens placed on the employer and the pension plan to arbitrate. But the next subsection, § 1401(b)(1), disposes of the contention that the parties evenly bear the burden of seeking arbitration. This is because § 1401(b)(1) says that "[i]f no arbitration proceeding has been initiated pursuant to subsection (a) of this section, the amounts demanded by the plan sponsor . . . shall be due and owning on the schedule set forth by the plan sponsor." Not only that, the plan can then immediately file suit to collect the entire amount of withdrawal liability, and in that proceeding the employer will have forfeited any defenses it could have presented to the arbitrator, see *Robbins v. Chipman Trucking, Inc.*, 866 F.2d 899, 902 (7th Cir. 1988) (observing that an employer "cannot bypass arbitration and litigate a defense to a withdrawal liability claim"). The upshot is that either party may seek arbitration, but only the employer suffers a consequence for failing to do so. So National Shopmen's failure to arbitrate has no bearing on the resolution of this case. In particular, the Fund's inaction does not, as the district court concluded, insulate DISA from the consequences of § 1401(b)(1).

Is there any reason to think that the MPPAA's exhaustion requirements are inapplicable when a pension

plan notifies an employer of a revised, as opposed to an original, assessment? DISA thinks so, because in its view National Shopmen lacked the authority to revise the assessment at all, meaning that DISA was under no obligation to pay the revised amount *or* submit the dispute to an arbitrator. According to DISA, the MPPAA provides only three methods by which a pension plan may revise its original assessment: (1) under § 1399(b)(2), the assessment may be altered after an employer challenges the calculation of withdrawal liability; (2) under § 1401(a), the assessment may be revised through arbitration proceedings requested by either party; and (3) under § 1401(b)(2), after arbitration proceedings have been completed, either party may file suit in federal court to "enforce, vacate, or modify the arbitrator's award." In DISA's view, because National Shopmen failed to pursue any of those paths, it lacks the authority to revise the original assessment and the revision is a "nullity."

We do not read the statute so rigidly. As a preliminary matter, only the second option identified by DISA is relevant in this context: National Shopmen could have initiated arbitration pursuant to § 1401(a) to resolve the dispute. Section 1399(b)(2) is inapplicable because it explains how an employer can challenge the plan's assessment of withdrawal liability, and § 1401(b)(2) is relevant only after arbitration proceedings have been completed. So in fact DISA's argument is that, pursuant to § 1401(a), a plan must seek arbitration if it wants to revise an employer's liability. This is a slightly different argument from the one we disposed of above,

because it focuses on the plan's authority to revise rather than on the operation of the exhaustion requirements. That distinction, however, is telling because it reveals that DISA's argument is based on a misunderstanding of § 1401(a)(1). As we have just explained, that provision establishes that arbitration is mandatory for all disputes concerning the plan's determination of withdrawal liability, and it also sets forth time limits governing when either party may initiate the proceedings. There is no reason to think that the exhaustion provision governs the substantive authority of a pension plan to revise an assessment of withdrawal liability.

Indeed, the MPPAA is silent with regard to a plan's authority to revise an assessment of withdrawal liability. But we are not left without any guidance on this issue, since the PBGC has long held the view that a plan may revise an assessment if it discovers an error in the calculation of liability while the assessment is still subject to arbitration or litigation. See PBGC Opinion Letter 90-2 (April 20, 1990); PBGC *Amicus* Br. at 6. According to the PBGC, "[i]f the employer contests the plan's right to revise its original assessment or issue a second assessment, this dispute, like other disputes involving withdrawal liability, must be resolved first through arbitration and then, if necessary, through the courts." Opinion Letter 90-2. Although we owe no deference to the position taken by the agency in an opinion letter, see *CenTra, Inc. v. Central States, Se. and Sw. Areas Pension Fund*, 578 F.3d 592, 601 (7th Cir. 2009) (adopting PBGC's position in an opinion letter), we find the agency's views persua-

sive. Given the strong preference the MPPAA establishes for the collection of withdrawal liability in a manner that protects the solvency of multiemployer plans, a fund must be able to revise an assessment of withdrawal liability, within a reasonable period of time, if it discovers that it has undercharged an employer.

The Fourth Circuit adopted exactly this position in *Masters, Mates & Pilots Pension Plan v. UXB Corp.*, 900 F.2d 727 (4th Cir. 1990). There, a pension fund revised its withdrawal liability assessment after realizing that it had mistakenly used the wrong date to calculate. The revision came over a year after the Fund made its initial assessment and after arbitration had been scheduled. The arbitrator, however, refused to consider the revised calculation because he thought the Fund waited too long to make the revision. The Fourth Circuit disagreed, observing that the purpose of the MPPAA was to ensure the "accurate collection of liabilities," and this goal could be achieved only if the fund was permitted to correct its miscalculation. *Id.* at 735. As long as the employer is not prejudiced by the revised assessment, *Masters* concluded, a plan may amend when necessary. *Id.*

DISA attempts to distinguish *Masters* by arguing that it merely established that a plan has the authority to correct *undisputed* errors in the calculation of withdrawal liability. While it is true that the "correctness of the revision and the error of the original" were not in dispute in *Masters*, see *id.*, that point cannot be dispositive. As the opposing arguments in this case illustrate, it may

be difficult to know *ex ante* whether a revision will lead to a more accurate assessment. A recalcitrant employer can make any asserted error disputed simply by disputing it. Even in the best of circumstances, the parties may genuinely disagree about the interpretation of the statute, which sets forth an intricate series of formulas that are not always straightforward to apply. *E.g.*, *Central States, Se. and Sw. Areas Pension Fund v. Safeway, Inc.*, 229 F.3d 605, 611 (7th Cir. 2000) ("The statutory and regulatory apparatus . . . are not models of clarity . . ."). Thus in our view whether a revision is disputed does not determine whether a plan has the authority to amend an assessment. Rather, we agree with our colleagues on the Fourth Circuit that a plan is entitled to correct what it believes to be errors in the calculation of withdrawal liability and revise an assessment as long as the employer is not prejudiced. At that point, the familiar "pay now, arbitrate later" rule kicks in and the exhaustion provisions of the MPPAA apply to the revised assessment as they would to the original. We note, finally, that when a plan issues a revised notice of withdrawal liability, the revision resets the statutory time limitations governing when an employer may challenge the assessment. See §§ 1399(b)(2)(A) and 1401(a). Only after the revision might the employer believe itself to be aggrieved and thus interested in arbitrating the dispute.

We recognize that *Shopmen I* and *Shopmen II* expressed concern that under our reading of the statute a pension plan could arbitrarily jack up an employer's payments after assessing a lower, perhaps uncontroversial, amount.

But we do not share this apprehension. As long as an employer is able to seek the full panoply of administrative and judicial remedies set forth in the MPPAA, there is little reason to think that a pension plan would be any more inclined to revise an assessment of withdrawal liability gratuitously than it is to make an arbitrary assessment in the first instance. If a plan's revised assessment is patently ridiculous, the arbitrator should promptly reject the revision. And if that avenue fails, the courts are available to vacate or modify the award—but only after the completion of arbitration proceedings. See § 1401(b)(2). Moreover, ERISA's fee-shifting provision, § 1132(g), combined with the fact that the plan would naturally have to return any payments to which it was not entitled, is sufficient to prevent arbitrary revisions. True, the employer is stuck with the higher bill in the interim, and that may be a cost it would rather not bear. But as we have explained, there are good reasons for the MPPAA's "pay now, fight later" rule, and Congress has decided to assign that cost to the withdrawing employer. Yet if the employer is nevertheless confident that the revision is indisputably incorrect, we have recognized limited situations where it is not obligated to make interim liability payments while seeking arbitration. See *Hunt Truck Lines, Inc.*, 272 F.3d at 1003 (recognizing one exception to the rule). The key, however, is that any dispute relating to the calculation of withdrawal liability *must* be resolved through arbitration.

The arbitration requirement could have been satisfied in this case if the parties had followed through with the

proceedings that were underway when the Fund filed suit in *Shopmen I*. If they had done so, we presume that *Shopmen I*, which held that DISA was not obligated to pay the revised amount while arbitration proceedings were pending, would have provided DISA with cover to pay only $652 per month until the dispute was resolved. National Shopmen did not appeal that decision to the D.C. Circuit, and of course we do not review it here. As we understand the statute, when a plan revises its assessment of withdrawal liability, the MPPAA compels the employer to comply with the revised assessment as if it were an original assessment and follow the standard statutory procedures for review. Nevertheless, we express no view on whether *Shopmen I* was correctly decided because it has no applicability where, as here, arbitration proceedings are not pending. As far as we are concerned, when DISA withdrew its request for arbitration on March 23, 2009, it lost the right to use *Shopmen I* as a shield from the Fund's demands for the revised amount. We note as well that nothing prevented DISA from filing a second request for arbitration after it received the January 24, 2007, notice from the Fund demanding $978 per month. Perhaps the arbitrator would have consolidated the new proceeding with the pending one; perhaps he would have handled them separately. There is no point in speculating further about this, because it did not happen.

By terminating the arbitration proceedings, DISA backed itself into a corner. When National Shopmen sent the April 8, 2009, notice—reiterating its demand for $978 per month as stated on January 24, 2007—DISA was left

with only one option: to comply. DISA's failure to do so constitutes default and operates as a forfeiture of its opportunity to dispute National Shopmen's calculation of its withdrawal liability. See 29 U.S.C. § 1401(b)(1). DISA's default means that National Shopmen prevails, and we need not reach the issue of statutory interpretation at the heart of this lawsuit. We note, however, that the PBGC takes the position that DISA's interpretation of the statute, requiring the Fund to factor in a zero to obtain a three-year average rather than averaging only two years, is correct. As always, we appreciate the agency's input. For the reasons stated above, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.