**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 23-3206

———————

CENTRAL STATES, SOUTHEAST AND SOUTHWEST
AREAS PENSION FUND, CHARLES A. WHOBREY, as
Trustee,

Appellants

v.

LAGUNA DAIRY, S. DE R.L. DE C.V., a Mexican Corpora-
tion formerly known as Laguna Dairy, S.A. de C.V.; LALA
BRANDED PRODUCTS LLC, a Texas limited liability com-
pany formerly known as Lala Branded Products, Inc.; GILSA
REAL ESTATE CO., LLC, a Nebraska limited liability com-
pany; FARMLAND DAIRIES LLC, a Delaware limited lia-
bility company; PROMISED LAND DAIRY, LLC, a Dela-
ware limited liability company formerly known as PL Newco,
LLC; SINTON DAIRY FOODS COMPANY L.L.C., a Colo-
rado limited liability company; NEW LAGUNA, LLC, a Del-
aware limited liability company

Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1:22-cv-01135)
District Judge: Honorable Todd M. Hughes

Argued September 23, 2024

Before KRAUSE, BIBAS, and AMBRO, <u>Circuit Judges</u>

(Opinion filed: March 27, 2025)

Andrew J. Herink **(Argued)**
Brad F. Berliner
CENTRAL STATES LAW DEPARTMENT
8647 W Higgins Road
Chicago, IL 60631

William A. Hazeltine
William D. Sullivan
SULLIVAN HAZELTINE ALLINSON
919 N Market Street
Suite 420
Wilmington, DE 19801

*Counsel for Appellants*

Rudolf Koch
Jason J. Rawnsley
RICHARDS, LAYTON & FINGER, P.A.
920 N King Street
Wilmington, DE 19801

James L. Bromley
Andrew J. Finn **(Argued)**
Zachary R. Ingber
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

*Counsel for Appellees*

---

OPINION OF THE COURT

---

**AMBRO**, Circuit Judge

The Multiemployer Pension Plan Amendments Act (MPPAA), 29 U.S.C. §§ 1381–1461, requires employers that withdraw from a multiemployer pension plan to cover the liability, interest, and penalties incurred by the withdrawal. *Bd. of Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 168 (3d Cir. 2002). Here, the Central States, Southeast and Southwest Areas Pension Fund (the "Fund") initially sought payment from two withdrawing employers, Borden Dairy Company of Ohio, LLC and Borden Transport Company of Ohio, LLC (the "Borden Ohio entities"). A dispute between the Fund and the Borden Ohio entities ended in a

3

settlement agreement entered during the pendency of an arbitration process. The Borden Ohio entities have since gone bankrupt and ceased making withdrawal liability payments. The Fund now seeks to collect those payments from other companies (the "Related Employers") that were commonly controlled with the Borden Ohio entities. Companies under common control can be held jointly and severally liable for withdrawal payments under the MPPAA. 29 U.S.C. § 1301(b)(1); *see also* 26 C.F.R. § 1.414(c)-2.

Before us is whether the Fund can sue to collect those payments. Our answer depends on whether the settlement agreement is properly understood under the MPPAA as a revision to the withdrawal liability assessment. We conclude it is. Because no employer began an arbitration with respect to that revised assessment, the Fund has a cause of action under § 1401(b)(1). Section 1399(b)(1) supplies the procedural requirements for notice and demand here, and the Fund met those requirements. We therefore reverse the District Court's order dismissing the Fund's suit under Federal Rule of Civil Procedure 12(b)(6).

## I. BACKGROUND

### A. Statutory Background

Congress enacted the MPPAA in 1980 to amend the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, increasing the protection of plans "when individual employers terminate their participation in, or withdraw from, multiemployer plans" with unfunded liabilities to pensioners. *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 (1984). Withdrawing employers must pay

4

the fund an amount calculated to "roughly match[] the employer's proportionate share of the plan's unfunded vested benefits." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997) (cleaned up); *see also* 29 U.S.C. § 1381. Entities under common control are jointly and severally liable for withdrawals from the fund by any member of the commonly controlled group. 29 U.S.C. § 1301(b)(1); *Flying Tiger Line v. Teamsters Pension Tr. Fund of Phila.*, 830 F.2d 1241, 1244 (3d Cir. 1987) ("Since a controlled group is to be treated as a single employer, each member of such a group is liable for the withdrawal of any other member of the group.").

The process of assessing withdrawal liability begins when the fund notifies the employer of the amount owed, the payment schedule, and a demand for payment. 29 U.S.C. §§ 1382, 1399(b)(1). The employer can then request that the fund review any matter relating to the liability and schedule. *Id.* § 1399(b)(2)(A)(i). The fund must respond by notifying the employer of its decision, the basis on which it relies, and a justification for any change from the initial liability and schedule. *Id.* § 1399(b)(2)(B).

Any continued dispute about the liability or schedule must be arbitrated. *Id.* § 1401(a)(1). The parties have a limited window to start arbitration. *Id.* If neither party starts it within the allotted time, the fund may bring a statutory claim to collect the amount it demanded "under section 1399(b)(1) . . . on the schedule [it] set forth." *Id.* § 1401(b)(1). If the parties instead complete arbitration and the arbitrator issues an award, any party can bring a statutory claim to enforce, vacate, or modify that award. *Id.* § 1401(b)(2).

5

Our case addresses a gap between these two types of statutory claims. What happens if the parties settle during an arbitration, meaning both that arbitration began and that no arbitral award issued?

B.     Factual and Procedural Background

Because we are reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6), we take the well-pleaded factual allegations in the complaint as true. *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

The Fund is a multiemployer pension plan. The Borden Ohio entities withdrew from the Fund in November 2014 per 29 U.S.C. § 1383. Those now-withdrawn entities are not parties here, but all the Related Employers allegedly were under common control with them. After the Borden Ohio entities withdrew, the Fund, pursuant to 29 U.S.C. §§ 1382(2) and 1399(b)(1), sent them a notice and demand for payment of withdrawal liability in January 2015 for approximately $41.6 million, or 240 monthly payments of $199,647.14.

In March 2015, the Borden Ohio entities sought review by the Fund of its assessment of the monthly withdrawal liability payment, contesting an alleged computational error. 29 U.S.C. § 1399(b)(2)(A). Thereafter, they sought arbitration under 29 U.S.C. § 1401(a)(1). Before the arbitration process finished, the Borden Ohio entities and the Fund entered a settlement agreement in August 2016. It reduced the monthly payment to $183,225.00. The Borden Ohio entities waived any

6

right to request review or to initiate arbitration and agreed to dismiss the existing arbitration with prejudice.[1]

The Borden Ohio entities made the agreed monthly payments until they petitioned for bankruptcy in the United States Bankruptcy Court for the District of Delaware in January 2020. During the bankruptcy proceedings, two of the employers in our case—Laguna Dairy, S. de R.L. de C.V. ("Laguna") and New Laguna, LLC ("New Laguna")—objected to the planned use of a reserve account because they wished for that money to be used to pay the pension liability owed by the Borden Ohio entities. Laguna and New Laguna ultimately released and waived their claims in a settlement relating to that account in exchange for their release from the obligation to indemnify the debtors for their withdrawal liability to the Fund. Although the Fund participated in other aspects of the bankruptcy cases, it was not a party to that agreement. In fact, it explicitly reserved its rights to seek payment for the withdrawal liability from non-bankrupt entities.

The Fund received $128,576.22 toward the withdrawal liability from the bankruptcy distributions. It then sent past-due

---

[1] In the relevant clauses, the agreement uses the term "Borden Controlled Group," App. 279–80, which it defines as "the Borden [Ohio] [e]ntities and all trades or businesses under common control with the Borden [Ohio] [e]ntities within the meaning of 29 U.S.C. § 1301(b)(1) and the regulations thereunder," App. 276. But only the Fund and the Borden Ohio entities executed the agreement. App. 283. It is thus unclear whether the agreement binds the commonly controlled entities, and counsel did not resolve the issue when asked at oral argument. We address the implications of this ambiguity *infra* at 12 & n.3.

notices to the non-bankrupt entities under common control with the Borden Ohio entities (namely the Related Employers[2]) who did not make any payments. The Fund sued in the U.S. District Court for the District of Delaware in August 2022.

The District Court granted the Related Employers' motion to dismiss under Rule 12(b)(6) in November 2023. It ruled that "the MPPAA does not provide a statutory cause of action to enforce a private settlement agreement." App. 12. More specifically, "the action under § 1401(b) is available only in cases where the arbitration proceeding has not been initiated within the statutory period or has been completed. It is not available where the arbitration proceeding has been initiated, but not completed, as is true here." App. 13. The District Court also concluded that the Fund failed to meet the procedural requirements for notice and demand outlined in 29 U.S.C. § 1399(b)(2).

## II.     ANALYSIS

The District Court had jurisdiction under 29 U.S.C. §§ 1132(e), 1132(f), and 1451(c). It issued a final order on November 17, 2023, and the Fund timely appealed to us on December 15, 2023. Our jurisdiction is under 28 U.S.C. § 1291, and we review *de novo* an appeal from a dismissal under Rule 12(b)(6). *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 166 (3d Cir. 2014).

---

[2] We need not determine which entities were in fact under common control because we take the well-pleaded allegations in the complaint as true. *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007).

A. Is the settlement agreement a revision of the withdrawal liability assessment, meaning the Fund would have a cause of action under 29 U.S.C. § 1401(b)?

The Fund contends that the settlement agreement constitutes a revised withdrawal liability assessment and that the Related Employers did not seek to arbitrate *that* assessment. If this framing is correct, the Fund could sue under § 1401(b)(1), which applies when no arbitration has been filed. It emphasizes that the dispute-resolution process outlined in the MPPAA was meant to benefit pensions by preserving their resources, not to impose hurdles to pension-initiated revisions.

The Fund relies on two key cases: *National Shopmen Pension Fund v. DISA Industries, Inc.*, 653 F.3d 573 (7th Cir. 2011); and *Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727 (4th Cir. 1990). In *DISA Industries*, a fund revised an employer's payment schedule based on a previous MPPAA interpretation error. 653 F.3d at 578–79. The Seventh Circuit rejected the employer's contention that the fund could only revise the initial assessment in response to an employer challenge, through arbitration, or through proceedings in federal court. *Id.* at 579. The Court relied on the purposes of the statute: "Given the strong preference the MPPAA establishes for the collection of withdrawal liability in a manner that protects the solvency of multiemployer plans, a fund must be able to revise an assessment of withdrawal liability, within a reasonable period of time, if it discovers that it has undercharged an employer." *Id.* at 580.

In *USX Corp.*, the Fourth Circuit similarly concluded that the MPPAA "simply does not address whether revisions

9

to withdrawal liability assessments must be made by plan sponsors within a certain period of time," nor does it address "the ability of a plan to cure errors in the original assessment once the employer has invoked arbitration." 900 F.2d at 735. Citing "one of the motivating purposes behind [the] MPPAA"—"requiring withdrawing employers to pay their proportional share of the plan's unfunded benefit obligations so as to relieve the funding burden on remaining employers," *id.* at 735–36—it concluded that "[a]bsent prejudice to the opposing party, the mere fact that a revision is offered late in the arbitration process is not enough to bar it," *id.* at 736. The Court therefore allowed the assessment to be revised during the arbitral process.

These cases are persuasive here. They demonstrate that (1) the purpose of the MPPAA is to ensure the solvency of multiemployer plans, and (2) case law has interpreted the statute liberally to protect plans' solvency. *DISA Indus.*, 653 F.3d at 580; *USX Corp.*, 900 F.2d at 735–36; *see also Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. - Pension Fund v. Centra*, 983 F.2d 495, 497–98 (3d Cir. 1992) (relying on the premise that funds may revise withdrawal liability assessments via settlement agreements); *Anita Founds., Inc. v. ILGWU Nat'l Ret. Fund*, 902 F.2d 185, 186–87 (2d Cir. 1990) (same). Drawing on those principles, we hold that the settlement agreement is properly understood as a revision to the withdrawal liability assessment; thus, the Fund has a cause of action under 29 U.S.C. § 1401(b) because the Related Employers did not file for arbitration regarding that revised assessment.

The text of the settlement agreement also supports this interpretation. It explicitly characterizes the agreement as "revis[ing]" the "2014 Withdrawal Liability" assessment that

10

the Fund first put forward. App. 278. The agreement also contains several references to sections of the MPPAA, supporting the Fund's position that this revision did not take the dispute outside the statutory scheme.

True, the statute, our precedent, and an opinion of the Pension Benefit Guaranty Corporation (PBGC) tell us that disputes under the MPPAA must be decided by an arbitrator in the first instance. *See* 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 to 1399 of this title shall be resolved through arbitration."); *Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 110 (3d Cir. 1990) ("The claims raised by both parties regarding the . . . assessment all concern the validity of the assessment, and arbitral procedure. These issues are central to the calculation of the withdrawal liability, and are reserved for arbitration."), *abrogated on other grounds by Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414 (1995); *Flying Tiger Line*, 830 F.2d at 1249 (emphasizing "the importance of the legislature's decision that arbitration, and not the courts, is the proper forum for the initial resolution of disputes [under MPPAA]" (internal quotation marks omitted) (second alteration in original)); PBGC, *Letter No. 90-2* (Apr. 20, 1990) ("If the employer contests the plan's right to revise its original assessment or issue a second assessment, this dispute, like other disputes involving withdrawal liability, must be resolved first through arbitration and then, if necessary, through the courts."). However, the time period for invoking arbitration has now run, so we must resolve the dispute.

The Related Employers here contend that they were not bound by the settlement agreement between the Fund and the

11

Borden Ohio entities (including its provision preventing further arbitration), thus leaving them free to seek arbitration as to the settlement agreement (a revision of the withdrawal liability assessment).[3] We agree that they could have done so. The problem is they did not. They slept on their rights and cannot overcome that failure by asking us now to decide what should have been decided by an arbitrator in the first instance.

Our conclusion today does not give funds free rein to revise their liability assessments whenever they please. We agree with our sister circuits that funds may revise liability assessments so long as the employer is not prejudiced and the revision was made in good faith. *See DISA Indus.*, 653 F.3d at 580; *USX Corp.*, 900 F.2d at 736. Treating the settlement agreement here as a revision does not prejudice the Related Employers, nor is there any evidence before us that the Fund acted in bad faith. *DISA Industries* suggests that an employer is not prejudiced if it can "seek the full panoply of administrative and judicial remedies set forth in the MPPAA." 653 F.3d at 581. The Related Employers contend that they would be

---

[3] If the Related Employers were bound by the settlement agreement, they would not have been permitted by its terms to pursue further arbitration relating to this dispute. In other words, they would have voluntarily relinquished their arbitral rights, which would still mean that no arbitration would begin as to the revised assessment. Our conclusion about the cause of action under 29 U.S.C. § 1401(b)(1) would still apply. As an aside, that the settlement agreement contemplated the possibility of arbitration under the MPPAA is further evidence that the parties understood their dispute still to fall within that statutory scheme and that the Related Employers were on notice of that understanding.

12

prejudiced by treating the agreement as a revision because they were not parties to it. But as explained above, they could have challenged the revision under the MPPAA. 29 U.S.C. §§ 1399(b)(2), 1401(a)(1); *see also IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127–28 (3d Cir. 1986) (holding that notice to one is notice to all entities in a commonly controlled group).

These inquiries regarding prejudice to an employer and bad faith by a fund create meaningful limitations on funds' ability to revise liability assessments. Far from allowing them to make revisions at any time for any reason, our holding today allows them to change their assessments only when they act in good faith and without prejudice to the affected employers. That holding also leaves undisturbed the requirement that a fund must begin the process of seeking payment from an employer "[a]s soon as practicable" under 29 U.S.C. § 1399(b)(1); *see also Allied Painting & Decorating, Inc. v. Int'l Painters & Allied Trades Indus. Pension Fund*, 107 F.4th 190, 198–99 (3d Cir. 2024).

The Related Employers' attempts to distinguish *DISA Industries* and *USX Corp.* are unpersuasive. They maintain the cases are off point because (1) they involved revisions to correct errors in applying the MPPAA statutory formula, not negotiated or discretionary changes, and (2) at the time of the revisions in question, the withdrawal liability arbitration either had not begun or was ongoing. On the first point, the reasoning of *DISA Industries* and *USX Corp.* does not rely on the revisions being made to correct actuarial errors; they rely on the policy behind the MPPAA of ensuring that multiemployer pensions remain solvent. *DISA Indus.*, 653 F.3d at 580–81; *USX Corp.*, 900 F.2d at 735–36. Tellingly, the Related Employers

13

do not explain why this distinction between actuarial errors and negotiated or discretionary changes matters.

The PBGC's guidance also contemplates discretionary changes. It opined that "plan fiduciaries have general authority to compromise disputed claims, abandon worthless claims, and otherwise conduct the plan's affairs so as best [to] serve the interests of participants and beneficiaries." PBGC, *Letter No. 87-12* (Oct. 27, 1987). "[R]ules which allow the trustees of a multiemployer pension plan to modify and lower a financially troubled employer's withdrawal liability payment schedule are consistent with ERISA and permissible under [§§] 4219(c)(7) and 4224." PBGC, *Letter No. 91-6* (Aug. 19, 1991); *see also* PBGC, *Requests to Review Multiemployer Plan Alternative Terms and Conditions to Satisfy Withdrawal Liability*, 83 Fed. Reg. 14,524, 14,525–26 (Apr. 4, 2018); *Keith Fulton & Sons, Inc. v. New England Teamsters & Trucking Indus. Pension Fund, Inc.*, 762 F.2d 1137, 1142–43 (1st Cir. 1985) (explaining that a plan is not necessarily bound to maximize withdrawal liability payments and that whether a plan has met its fiduciary duty in making its assessment is a case-by-case determination). Thus, the Fund's modifying the withdrawal liability assessment in response to a settlement agreement that considered the financial condition of the withdrawing employer should not affect our analysis.[4]

---

[4] Worth repeating is that this dispute began with an alleged computational error. The recitals in the settlement agreement specify that the withdrawing employers contested the amount of the withdrawal liability, and counsel for the Fund represented at oral argument that the basis for that challenge was an arithmetical error.

14

On the second point, the Related Employers mischaracterize the procedural posture of *DISA Industries*. Although they are correct that *USX Corp.* involved an arbitration that had not yet concluded, 900 F.2d at 736, *DISA Industries* by contrast involved an employer that voluntarily chose to terminate an arbitration, 653 F.3d at 577–78, 582. It is therefore similar to our case: both involve voluntary terminations of arbitration. In *DISA Industries*, the employer "was left with only one option: to comply" once it backed out of the arbitration. *Id.* at 582. Even assuming they were not bound by the Borden Ohio entities' agreement not to pursue further arbitration, the Related Employers then voluntarily chose not to pursue arbitration with respect to the revised withdrawal liability assessment. *DISA Industries* is therefore pertinent.

The District Court emphasized that 29 U.S.C. § 1401(b)(1) "provides a cause of action to collect amounts based on the 'schedule set forth by *the plan sponsor.*'" App. 14 (quoting § 1401(b)(1) with emphasis added). So it concluded that a settlement agreement negotiated and entered by *both* the plan sponsor (the Fund) and the withdrawing employers (the Borden Ohio entities) did not meet this requirement of § 1401(b)(1). We disagree. The plan sponsor here was still involved in setting the schedule, as the statute outlines. Further, making this distinction would create barriers to settlement. Why would a fund seek mutual agreement on a schedule if it is then barred from suing to enforce that schedule? We decline to adopt a rule that would discourage settlements in this way, especially as they serve the purpose of the MPPAA by resolving disputes more quickly and thereby protecting the solvency of multiemployer plans. *DISA Indus.*, 653 F.3d at 580–81; *USX Corp.*, 900 F.2d at 735–36.

15

Another potential objection to our reading could be that allowing funds to modify their withdrawal liability assessments strays from the timelines outlined in the statute. The MPPAA requires a fund to send its calculation of withdrawal liability "[a]s soon as practicable" after an employer withdraws. 29 U.S.C. § 1399(b)(1). The employer must send informal comments on the pension's withdrawal liability calculation within 90 days of receipt, *id.* § 1399(b)(2)(A), and either party can start arbitration to resolve differences within 180 days after it sends its comments, *id.* § 1401(a)(1). Once that arbitration is over, either party has 30 days to file a suit seeking to modify the arbitrator's awarded withdrawal liability. *Id.* § 1401(b)(2). But importantly, it would not have been practical for the Fund to seek payment from the Related Employers until after the Borden Ohio entities' bankruptcy. It could not have anticipated until then that it would no longer be able to seek payment directly from the withdrawing employers. Moreover, revising the assessment under our reading starts the clock anew for an employer to respond or to seek arbitration, so the deadlines do not become irrelevant. And funds are always incentivized to get paid as quickly as possible to maintain solvency, so modification by the funds is unlikely to undermine the statutory purpose of timely adjudication.

In short, the settlement agreement is properly understood under the MPPAA as a revision to the withdrawal liability assessment. Because no employer sought arbitration with respect to that revised assessment, the Fund has a cause of action under § 1401(b)(1).

16

## B. Did the Fund follow the procedural requirements of 29 U.S.C. § 1399(b)?

The District Court ruled that the settlement agreement did not meet the notice-and-demand criteria of § 1399(b)(2)(B). That section requires a fund, in response to an employer's comment or request for review, to "notify [an] employer of": "(i) the plan sponsor's decision, (ii) the basis for the decision, and (iii) the reason for any change in the determination of the employer's liability or schedule of liability payments." 29 U.S.C. § 1399(b)(2)(B). The Related Employers maintain that the District Court was correct: the settlement agreement did not meet those procedural criteria for a revision of the withdrawal liability assessment.

We agree. The settlement agreement does not explain the basis for the Fund's decision or the reason for the change in the liability, nor does the Fund so contend. The District Court thus correctly ruled that the settlement agreement did not meet the notice-and-demand requirements of § 1399(b)(2)(B).

But that does not answer the broader question whether the Fund complied with the requirements in § 1399(b). It contends that § 1399(b)(1) applies when an employer has yet to begin an arbitration proceeding. Because, in its view, the settlement agreement created a withdrawal liability assessment to which the Related Employers did not object or seek arbitration, § 1399(b)(1) applied. Under it, "[a]s soon as practicable after an employer's complete or partial withdrawal, the plan sponsor shall (A) notify the employer of (i) the amount of the liability, and (ii) the schedule for liability payments, and (B) demand payment in accordance with the schedule." 29 U.S.C. § 1399(b)(1) (cleaned up). Because notifying one member of a

17

commonly controlled group suffices to notify all members, *Barker & Williamson, Inc.*, 788 F.2d at 127–28, and because notice provisions are construed liberally to protect retirement benefits, *Foodtown, Inc.*, 296 F.3d at 175, the Fund asserts that the settlement agreement satisfied the requirements of § 1399(b)(1).

It is correct. We concluded above that the settlement agreement is properly understood as a revision of the withdrawal liability assessment and the Related Employers failed to file an arbitration proceeding with respect to that revised assessment. Section 1399(b)(1) applies because of that same failure to file. Further, the settlement agreement outlined an amount owed, a payment schedule, and a demand for payment, thus satisfying all the requirements of the provision. And case law establishes that a document need not be a formal notice-and-demand letter to suffice under that section. *See Chi. Truck Drivers v. El Paso Co.*, 525 F.3d 591, 598 (7th Cir. 2008) (holding that the standard is "indulgent about the specific form a notice and demand may take"); *Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 263 (2d Cir. 1990) (holding that a complaint met the MPPAA's notice requirements).

The Related Employers contend that relying on § 1399(b)(1) makes little sense because that section applies to an initial assessment and (b)(2)(B) to a revised assessment. In their view, if the procedures of (b)(1) could be used when *revising* withdrawal liability, then (b)(2)(B) would be superfluous. But this contention is unpersuasive because we draw the line between (b)(1) and (b)(2)(B) differently. The former applies when an employer chooses not to comment on an assessment, as happened here with respect to the settlement

18

agreement, whereas (b)(2)(B) applies when an employer comments on an assessment. *See* 29 U.S.C. § 1399(b)(2)(A)-(B). The text of (b)(2)(B) is indeed more stringent than (b)(1), but (b)(2)(B) has an important role to play, as it still applies following an employer comment.

The Related Employers further object that the settlement agreement does not "reference the general notice provision of [§] 1399(b)(1)" and that the agreement disclaims the statute's dispute-resolution process, removing the dispute from the statutory scheme. Appellees' Br. 21–22. These arguments fall short. Section 1399(b)(1) does not call for a specific invocation of the statute; it simply requires listing an amount owed, a payment schedule, and a demand for payment, which were all present in the settlement agreement. Moreover, that the Borden Ohio entities or the Borden Controlled Group, *see supra* 7 n.1, agreed not to pursue further arbitration hardly removes the entire dispute from the statutory scheme, particularly under the Fund's reading of the settlement agreement as a revision. And as discussed above, the settlement agreement frequently referenced the MPPAA and thereby put the Related Employers on notice that the parties still considered the dispute to fall within the statutory scheme.

In short, § 1399(b)(1) applies, and the Fund has met its requirements.

C.      The Dissent's Settlement Trap

Our dissenting colleague urges us to adopt a reading of the statute that we believe is hyperliteral and contrary to common sense. *Cf. RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (Scalia, J.). In his view, once

19

the parties choose arbitration, they cannot obtain judicially enforceable relief unless the arbitrator enters an award. This reading turns settlements into traps. Rather than encouraging parties to work out disagreements on their own, the dissent would transform a settlement—the replacement for an arbitral award—into a mere piece of paper that cannot be enforced. Unfunded pensions would be left without recourse. That result runs headlong into the statute's purpose: a "strong preference" for collection "in a manner that protects the solvency of multiemployer plans." *DISA Indus.*, 653 F.3d at 580. Adopting the dissent's approach would discourage settlements altogether.

If followed, that path also would create a circuit split. As outlined in more detail above, other circuits rely on the same principles that we do: (1) the purpose of the MPPAA is to ensure the solvency of multiemployer plans; and (2) case law interprets the statute flexibly to protect plans' solvency. *DISA Indus.*, 653 F.3d at 580; *USX Corp.*, 900 F.2d at 735–36. The dissent explicitly rejects these decisions, calling them "outdated" and "flaw[ed]." Diss. Op. at 9. We decline to create a circuit split, choosing instead to follow the persuasive reasoning of our sister circuits.

In addition, the dissent overstates the practical consequences of our decision. It worries that our approach would allow funds to revise the liability amount and schedule "at any time" and "as many times as they want." Diss. Op. at 7. But as we outlined above, such revisions would be sharply limited by two requirements: (1) they cannot prejudice the employers; and (2) they must be made in good faith. These strict constraints would hardly allow for an "infinite loop" of changes. Diss. Op. at 8.

Finally, our dissenting colleague highlights "two fixes" that he believes would leave room for settlements under his reading of the statute. Diss. Op. 9. First, he points out that the parties could still enforce their contractual rights under state law. That may be true, but it is irrelevant to the question before us. We are called on in a federal court to interpret federal law, specifically the MPPAA, and remedies in another court system under another body of law have no bearing on that inquiry. Second, our colleague notes that a fund can—though it need not—ask the arbitrator to enter the settlement agreement as an award. But this invites the response of why ask an arbitrator to enter a judgment on a matter not decided by that arbitrator (and, indeed, perhaps contrary to that person's inclination). We will not endorse this suggestion of formalism, particularly in the face of text in § 1401(b)(1) that negates the need for that step.[5]

\* \* \* \* \*

The settlement agreement is properly understood as a revision to the Fund's withdrawal liability assessment. Because no employer sought arbitration regarding that revised assessment, the Fund has a cause of action under § 1401(b)(1). It follows that § 1399(b)(1) supplies the procedural requirements for notice and demand here. The Fund met those requirements. We thus reverse the District Court's order dismissing the Fund's suit under Federal Rule of Civil Procedure 12(b)(6) and remand the case for further proceedings.

---

[5] It also appears that the dissent's demand for an arbitrator to enter a settlement as an arbitral award may be contrary to the common practice of parties involved in MPPAA disputes, including the Fund itself. *See* Fund Supp. Mem. 1–3.

21

*Central States v. Laguna*, No. 23-3206

BIBAS, *Circuit Judge*, dissenting.

When "the statutory language provides a clear answer," our analysis "ends there." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). Yet the majority neither starts nor ends there. Instead, it relies on abstract statutory purpose, atextual precedents from other courts, and a non-binding opinion from an agency. In doing so, it reshapes ERISA's text to help a pension fund and retirees. I see the policy benefits of that result, but I do not see how we can read ERISA's text to get there. Because we may not use purpose to override clear text, I respectfully dissent.

## I. THE PENSION FUND AND THE EMPLOYER IGNORED ERISA'S RULES

### A. Central States settled Borden's withdrawal liability outside arbitration

Central States is a multiemployer pension fund, and Borden Dairy and Borden Transport (collectively, Borden) are companies that contributed to it. But Borden pulled out, incurring ERISA withdrawal liability. So Central States notified Borden that it owed more than $41 million for withdrawing; Borden disputed that number. They started arbitrating but settled contractually. In the settlement, Borden agreed to pay Central States about $183,000 per month for about twenty years, a total of roughly $40 million. As part of the settlement, they agreed to ask the arbitrator to dismiss with prejudice. But he never entered an award. Still, Borden began to pay each month.

Borden paid roughly $10 million of that, but then went bankrupt and stopped paying. Central States recovered only about $128,500 from the bankruptcy. Looking for someone to make it whole, Central States told Borden's affiliates that they were on the hook because of ERISA's joint-and-several liability. When they refused to pay, Central States sued them. The District Court dismissed the case for failure to state a claim, reasoning that Central States did not have a cause of action under ERISA because it had started an arbitration but not completed it. It was right.

## B. Congress set out two specific paths that funds must follow to recover withdrawal liability

Congress passed ERISA "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans" before enough funds had accumulated. *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984). But employers threaten that scheme when they pull out of funds. So Congress amended ERISA by passing the Multiemployer Pension Plan Amendments Act. *Id.* at 723–25. Under that Act, "[i]f an employer withdraws from a multiemployer plan … then the employer is liable to the plan" for some of the lost money. 29 U.S.C. § 1381(a).

In that Act, Congress made specific choices about *how* funds, like Central States, could pursue withdrawal liability. It prescribed some threshold steps and then two paths.

*Threshold steps*: When an employer withdraws, the fund's sponsor (its board or administrator) must "determine the amount of the employer's withdrawal liability." §§ 1301(a)(10), 1382(1). It must act immediately: "As soon as

2

practicable after an employer's complete or partial withdrawal," the fund must "(A) notify the employer of (i) the amount of the liability, and (ii) the schedule for liability payments, and (B) demand payment." §1399(b)(1). By moving promptly to collect what it is due, it ensures that it has enough money to pay benefits to its members on time.

After that, the employer can raise issues with the fund's determination. It has ninety days to ask for review of the claimed liability and schedule, flag errors, and provide other information. §1399(b)(2)(A).

Once it gets the employer's response, the fund decides the final liability amount and schedule and tells the employer its decision and reasons. §1399(b)(2)(B). The employer must pay that amount. §1399(c)(1)(A)(i).

If the employer objects, the parties may take one of two paths: (1) arbitrate any remaining disputes, have an arbitrator enter an award, and sue to enforce or change that award; or (2) forgo arbitration, letting the fund sue to enforce its payment schedule. (Because some of the threshold steps are allowed but not required, the plan and the employer can take either path before the fund responds to the employer's objections.)

*Path 1*: If disputes remain, they "*shall* be resolved through arbitration." §1401(a)(1) (emphasis added). This arbitration happens only once. Either party can start it within 60 days of either (a) when the fund responds to the employer's objections by telling it how much it owes, or (b) when 120 days have passed after the employer asks for review, whichever is earlier. *Id.* Or the parties may jointly agree to arbitrate within 180 days of when the fund first notifies the employer of its liability. *Id.*

3

After an arbitration is "*complet[ed]* … in favor of one of the parties," either party may sue to "enforce, vacate, or modify the arbitrator's award." § 1401(b)(2) (emphasis added).

*Path 2*: "If no arbitration proceeding has been initiated" to resolve disputes, the fund can sue to collect the amounts owed under its payment schedule. § 1401(b)(1).

Those paths are the only ones offered by the statute. And they are mutually exclusive. If parties have chosen arbitration, then they cannot go down Path 2. They have chosen Path 1. This does not change if the parties chose arbitration but the arbitrator did not enter an award. The parties are still in the middle of Path 1. The statute does not create a Path 3 letting them jump somewhere else. That is the situation here.

## The Statute's Pathways



## C. Central States and Borden ignored ERISA's rules

Though the parties started out just fine, eventually they got off track. Two months after Borden withdrew, Central States demanded payment on a schedule. Borden raised issues and later started arbitration. But then they went astray; although they started down Path 1 by arbitrating, they did not follow the path all the way. Instead, they settled contractually and agreed to ask the arbitrator to dismiss without letting him enter the

settlement as a final award. If he *had* entered an award, either side could have sued to enforce it. § 1401(b)(2). But there is no award here to enforce. And because an "arbitration proceeding has been initiated," Central States cannot switch to Path 2 to sue for the original amounts owed under its payment schedule. § 1401(b)(1). So Central States has stranded itself in a no-suit zone: an arbitration was started (knocking out Path 2) but never ended (knocking out Path 1). The District Court thus properly dismissed the case.

**Central States Never Finishes Path 1**



## II. The Majority Slights ERISA's Text

To avoid ruling against the fund, the majority sets aside ERISA's text in favor of its supposed purpose, purposivist precedents from sister circuits, and a non-binding agency opinion.

To start, the majority calls Central States' contractual settlement a "gap" in the statute. Maj. Op. 5. But the statute sets forth two clear routes to dispute and change withdrawal liability: either through an arbitral award or through a court judgment. A private settlement, outside arbitration or court, is neither of these. If that is a gap, it was left there by Congress. It is not our job to fill it in to build a different statute.

Then the majority tries to shoehorn Central States' settlement into ERISA's text, saying funds can reset withdrawal liability whenever they please. But nothing in the text or its context supports that conclusion. To the contrary, ERISA assumes that funds set the liability amount and schedule only once, starting "[a]s soon as practicable after an employer's . . . withdrawal." §1399(b)(1). The parties may unilaterally trigger arbitration, but only within a sixty-day window of either (1) when the fund makes its final decision or (2) when 120 days elapse after the employer asks to revise the initial liability amount and schedule, whichever comes first. §1401(a)(1). Or they may jointly agree to arbitrate within 180 days of the fund's initial demand. *Id.* These timelines mean nothing if the fund can restart the process at any time.

The majority's opinion adds a loop by drawing up a Path 3: a side ramp that lets funds get off the main path at any time (and presumably as many times as they want) to return to the beginning, restarting the entire process.



**The Majority Creates a New Route**

The majority, given its focus on purpose, should be uncomfortable with that potentially infinite loop. It undermines these provisions' specific purpose: giving the parties certainty and finality. Congress set forth rules to keep pension funds solvent; it did not create a free-for-all. To limit its new workaround, the majority must invent a good-faith requirement. But courts cannot broaden "a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 590 U.S. 595, 600,

140 S. Ct. 1721, 1725 (2020). That atextual invention should tip us off that the majority has gone astray.

The majority insists that following the text would discourage settlements, turning them into "traps." But this concern overlooks two fixes. For one, parties who fail to follow the statute (like the ones here) keep their contractual rights under state law. For another, they could easily avoid this "trap" by having an arbitrator enter the settlement as his award. That would let them sue under Section 1401(b)(2). My colleagues puzzle over why one would need to ask the arbitrator to enter this award. But the answer is simple: § 1401(b)(1) applies only if "no arbitration proceeding has been initiated." § 1401(b)(1). So once arbitration starts, the fund may sue only under § 1401(b)(2). And that section applies only for suits "to enforce, vacate, or modify the arbitrator's award." § 1401(b)(2). If there is no award, there can be no suit under § 1401(b)(2).

Without any textual argument, the majority turns to precedents from other circuits. But those precedents rely on outdated purposivist reasoning. The Seventh Circuit thought that the statute "is silent with regard to a plan's authority to revise an assessment of withdrawal liability." *Nat'l Shopmen Pension Fund v. DISA Indus.*, 653 F.3d 573, 580 (7th Cir. 2011). To fill in that supposed silence, that court (like my colleagues) relied on the Pension Benefit Guaranty Corporation's nonbinding reading of the statute, rather than the statute itself. *Id.* But courts may not rely on what agencies say; we must read statutes for ourselves, exercising our own judgment. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). At bottom, the Seventh Circuit's reasoning turned on one of the statute's purposes—"the strong preference the [Act] establishes for the

9

collection of withdrawal liability in a manner that protects the solvency of multiemployer plans"—at the expense of its text. 653 F.3d at 580.

The Fourth Circuit similarly went astray. It too thought that the "statute is silent as to the ability of a [fund] to cure errors in the original assessment" by revising it outside of responding to the employer, arbitrating, or suing in court. *Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 735 (4th Cir. 1990). Instead of focusing on the text, it chose to "promot[e] one of the motivating purposes behind [the Act]— requiring withdrawing employers to pay their proportional share." *Id.* at 735–36. Yet free-floating purpose cannot trump text.

This debate about how to use purpose is an ancient one. The traditional rule is that, if judges may rely on general statutory purpose at all, they may do so only when the text is unclear. *See, e.g.*, 1 William Blackstone, *Commentaries* \*59–62; 1 Joseph Story, *Commentaries on the Constitution of the United States* §§ 398–401, at 383–84 (Boston, Hilliard Gray and Co. 1833). Courts must first apply the other traditional tools of statutory construction—primarily text, structure, and context— before looking elsewhere. *See* 1 Blackstone \*59–60. Indeed, "[w]here the words are plain and clear, and the sense distinct and perfect arising on them, there is generally no necessity to have recourse to other means of interpretation." 1 Story § 401, at 384. When trying to figure out what lawgivers meant, "the first resort in all cases is to the natural signification of the words employed, in the order of grammatical arrangement in which the framers of the instrument have placed them." Thomas M. Cooley, *A Treatise on the Constitutional*

10

*Limitations Which Rest Upon the Legislative Power of the States of the American Union* \*57 (Boston, Little Brown & Co. 1868). Vaulting over the clear text to purpose risks "destroy[ing] all law, and leav[ing] the decision of every question entirely in the breast of the judge." 1 Blackstone \*62. That ancient temptation remains, but judges ought to resist it.

\* \* \* \* \*

When the statutory text yields a clear result, we should start and end with it. To achieve a better result, the majority starts instead with the statute's purpose. Though I see the benefits of getting the fund its funding, I cannot agree to bypassing ERISA's text to do so. I respectfully dissent.